IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | |
|---|---|
| **MARIO G. CENTOBIE** | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| vs. | ) Case No. 2:05-CV-848-RDP-TMP |
| | ) |
| **DONAL CAMPBELL, Commissioner,** | ) |
| **Alabama Department of Corrections,** | ) |
| | ) |
| Respondent. | ) |

## MEMORANDUM OPINION

The court has before it the Motion for a Stay of Execution Pursuant to 28 U.S.C. § 2251; Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254; Motion for Appointment of Counsel and an Expert; and Motion for an Evidentiary Hearing filed by an attorney who seeks to represent Mario G. Centobie ("Centobie"), although admittedly against Centobie's wishes, at 9:44 p.m. on April 22, 2005. In summary, the filing seeks an order from this court staying Centobie's execution, which is currently scheduled for April 28, 2005. The motion and petition allege, in essence, two grounds for staying the execution and for granting habeas relief: (1) that Centobie is currently mentally incompetent to the degree that his execution would violate his Eighth Amendment right to be free of cruel and unusual punishment, and (2) Alabama's lethal injection protocol causes unnecessary pain and therefore violates the Eighth Amendment.

## PROCEDURAL HISTORY

After a jury trial in May 1999, Centobie was convicted of capital murder for the shooting death of Moody Police Officer Keith Turner. The jury recommended the imposition of the death sentence by a vote of 10 to 2. The trial judge imposed a sentence of death following a sentencing

hearing on July 8, 1999. The Alabama Court of Criminal Appeals affirmed the conviction and sentence on August 31, 2001, and the Alabama Supreme Court denied his petition for writ of certiorari on February 14, 2003. Thereafter, Centobie instructed his attorneys not to seek certiorari from the Supreme Court of the United States or otherwise to seek further appeals or reviews of his conviction and sentence. Neither Centobie nor anyone on his behalf filed any state post-conviction petition, and no federal habeas petition was filed until the instant one. On the State's motion and after all time deadlines for seeking collateral review had expired, the Alabama Supreme Court entered an order scheduling Centobie's execution for April 28, 2005.

The instant petition was filed on Centobie's behalf on April 22, 2005. The respondent filed a motion to dismiss the petition on April 26, 2005, asserting that counsel lacked standing to file the petition contrary to Centobie's wishes, and that neither claim asserted in the petition warrants a stay of execution. In support of its motion to dismiss, the State has filed two declarations. The first is from Centobie himself wherein he makes abundantly clear that he has not authorized the filing of the petition, does not wish to seek relief in this court, and does not want to be incarcerated for the rest of his life. The second declaration is from Lesleigh Dodd, M.S., M.H.P. Dodd is a mental health professional with Mental Health Management, a company which contracts to provide services to the Alabama Department of Corrections. She attests that she observed Assistant Attorney General Clay Crenshaw question Centobie for two and one half hours for the purpose of preparing Centobie's declaration. Dodd reports that:

> During the questioning Centobie was rational and coherent. He exhibited some anger when Crenshaw showed him the habeas petition because he said that he did not want anything filed to stop the execution. Mr. Centobie exhibited a full range of appropriate affect and responded coherently to all questions. He was polite, logical, and

>oriented in all spheres. He denied suicidal ideation a couple of times. Based upon my observations this date, I saw no evidence of a thought disorder. I have never met Centobie or Crenshaw before today.

Dodd Declaration at p. 2., ¶ 4.

## STANDING

The instant petition seeking a stay of execution pursuant to 28 U.S.C. § 2251 and habeas corpus relief pursuant to 28 U.S.C. § 2254 was filed by Katherine Puzone ("Puzone"), an attorney affiliated with the Federal Defenders, Middle District of Alabama. Puzone candidly admits that in spite of repeated offers to Centobie to represent him, he has "so far declined" her representation.[1] (Motion For Stay, p. 6.) It is further clear that Centobie has clearly and unequivocally stated that he does not want to seek any further avenue of appeal or collateral relief. Nevertheless, Puzone filed the instant petition on the evening of April 22, 2005, asserting, essentially, that carrying out the execution set for April 28, 2005, would violate Centobie's federal constitutional rights because Centobie never had a post-conviction[2] hearing in either state or federal court to adjudicate the issue of his competence to refuse counsel or to waive the filing of the instant petition. Puzone seeks to be appointed as counsel to represent Centobie, appointment of an expert to assist in determining Centobie's mental competency, an evidentiary hearing on the issue of competency, and further relief

---

[1] Puzone met with Centobie at the prison where he is incarcerated, and she admits that on both occasions he told her he did not wish to pursue any available avenue of relief. She attempted to visit him again, and he twice declined to meet with her. She sent a licensed social worker from her office to meet with him, but he declined to meet with the social worker. She sent him a letter informing him that he still could pursue federal habeas relief. She met with him again on April 20 and 21, 2005, at which time he "insisted" that he wanted to die. On April 22, 2005, Centobie telephoned Puzone more than once and stated that he did not want anything filed on his behalf.

[2] It is undisputed that Centobie had a competency hearing, and was found competent to stand trial, before he was convicted of Officer Turner's murder.

in the form of a stay of execution.

The initial issue raised by the petition is whether Puzone has standing to assert such claims on behalf of Centobie. It is a central premise of federal jurisdiction that a person asserting a claim must have standing to pursue it. Under Article III of the United States Constitution, the jurisdiction of federal courts is limited to "actual cases and controversies." U.S. Const., art. III, § 2, cl. 1. Ordinarily, then, a case may be brought only by the person or entity who has suffered an injury and who stands to receive redress as a result of the litigation. An exception exists in the limited situation of an injured person who is unable to seek relief himself and may obtain adjudication of his claims through a "next friend." *See, e.g.*, *Ford v. Haley*, 195 F.3d 603, 624 (11th Cir. 1999). The burden of showing the propriety of bringing an action on the part of another person lies with the third party seeking jurisdiction. *Whitmore v. Arkansas*, 495 U.S. 149, 164 (1990).

The standing of a third party to raise claims on behalf of a death row inmate has been addressed on multiple occasions by the Supreme Court. *Whitmore*, 495 U.S. at 149; *see also, Gilmore v. Utah*, 429 U.S. 1012 (1976); *Lenhard v. Wolff*, 443 U.S. 1306 (1979). In *Whitmore*, a death row inmate sought to challenge the imposition of the death penalty upon another death row inmate. The Court considered whether the second inmate had standing as a "next friend" as a basis for jurisdiction.

The Court in *Whitmore* specifically asked whether the "uniqueness of the death penalty and society's interest in its proper imposition ... justify a relaxed application of standing principles" and answered its own question in the negative. 495 U.S. at 161. The strict requirements of standing derive directly from the Constitution and the Court concluded it was not for it "to employ untethered notions of what might be good public policy to expand our jurisdiction in an appealing case."

4

*Whitmore*, 495 U.S. at 161. Furthermore, the Court noted that the remedy of habeas corpus never was intended to be made available to "intruders or uninvited meddlers, styling themselves [as] next friends." 495 U.S. at 164, *quoting United States ex rel. Bryant v. Houston*, 273 F. 915, 916 (2d Cir. 1921). Accordingly, *Whitmore* teaches that the long-established and deeply rooted notions of standing hold as firmly in cases that challenge the death penalty as in any other type of federal litigation.

The Eleventh Circuit recently addressed the issue of standing in a habeas petition that, like the instant petition, was filed by an attorney who worked for an entity that represented death row inmates. In *Sanchez-Velasco v. Secretary of the Department of Corrections*, 287 F.3d 1015 (11th Cir. 2002), a Florida death row inmate "insisted" that he wanted his death sentence to be carried out. *Id.* at 1017. Nevertheless, an attorney affiliated with the Capital Collateral Regional Counsel of Florida filed a § 2254 petition on Sanchez-Velasco's behalf but without his permission. The district court granted the attorney limited standing to proceed, appointed an expert to examine the inmate, and conducted an evidentiary hearing as to Sanchez-Velasco's mental competency. Afterward, the district court granted the inmate's *pro se* motion to dismiss the § 2254 petition, and the attorney appealed. The Eleventh Circuit examined whether the attorney had standing under the "next friend" doctrine. The court observed that standing is "by no means granted automatically to whomever seeks to pursue an action on behalf of another." *Id.* at 1025, *quoting Whitmore*, 495 U.S. at 163.

The Eleventh Circuit applied a two-prong test that must be met in order for a third party to achieve standing. First, a person seeking to represent another must "provide an adequate explanation – such as inaccessibility, mental incompetence, or other disability – why the real party in interest cannot appear on his own behalf." *Sanchez-Velasco*, 287 F.3d at 1025. Second, the party seeking

5

to be deemed a "next friend" must demonstrate that he or she is "truly dedicated to the best interests of the person on whose behalf" the action is filed. *Id.* Moreover, "it has been further suggested that a 'next friend' must have some significant relationship with the real party in interest." *Id.* Puzone cannot meet either prong.

In *Sanchez-Velasco*, the attorney failed to satisfy the second prong.[3] The court noted that the requisite "significant relationship" may exist where the attorney has represented the real party in interest in the past with that person's consent, 287 F.3d at 1026, *citing Ford v. Haley*, 195 F.3d 603 (11th Cir. 1999), or where the would-be "next friend" is a close relative.[4] In *Sanchez-Velasco*, the attorney seeking to represent the inmate was not related to the inmate, did not know the inmate, and had not met or talked with the inmate prior to filing the petition. The court characterized the two as "total stranger[s]." *Sanchez-Velasco*, 287 F.3d at 1027.[5] The court held that the attorney had no standing to pursue the inmate's claims, and explained that the attorney did not establish that he truly was dedicated to the best interests of the inmate, but instead appeared to be "pursuing his own

---

[3] The Eleventh Circuit further determined, however, that an independent ground for affirming the district court's dismissal of the petition was failure to satisfy the first prong, or failure to demonstrate the mental incompetency of the inmate.

[4] Even a close relative, however, would have to prove more than a blood relationship, and would be required to show some real dedication to the inmate's interests. *See, e.g., Hauser v. Moore*, 223 F.3d 1316, 1322 (11th Cir. 2000) (denying next friend status to biological mother).

[5] The court notes that counsel in the instant matter has candidly informed the court that Centobie did not consent to her representation and, in fact, clearly stated that he does not wish to seek habeas relief. Unlike counsel in *Sanchez-Velasco*, there appears to be no omission or obfuscation of the nature of Puzone's relationship with Centobie. Puzone admits she has almost no relationship with Centobie. Centobie has met with her only a few times, declined her offers to represent him, specifically expressed a desire to forgo any litigation, and has since refused to meet with her again. Centobie's declaration and Puzone's motion are in agreement with respect to each of these matters.

interests in opposing the imposition of the death penalty." 287 F.3d at 1029.

As in *Sanchez-Velasco*, Puzone, the attorney seeking to represent Centobie, has failed to demonstrate that she has a significant relationship with Centobie so as to permit her to seek redress on his behalf. She has never represented him before and has met with him on only four occasions. On each occasion he told her that he did not wish to pursue any collateral relief. Other attempts to maintain any type of relationship with Centobie were thwarted by Centobie's refusal to meet with Puzone or her representative. The only other contact the two have had was when Centobie called her "multiple" times on April 22, 2005 – the day on which the instant petition was filed. In his telephone calls to her, Centobie clearly told Puzone that he "did not want anything filed on his behalf." (Motion, p. 7.)

In response to the instant motion, the respondent on April 26, 2005, filed a motion to dismiss the habeas petition, in which he asserts that Puzone lacks standing to bring the instant action. In support of the motion to dismiss, respondent attached the declaration of Centobie, signed and witnessed on April 25, 2005. In the declaration, Centobie asserts that he is not represented by a lawyer, that he does not want to be represented by a lawyer, and that he is assisting in the respondent's efforts to dismiss the petition because he wants "to stop Ms. Puzone from filing anything on [his] behalf." He further asserts that Puzone is filing the motions "to pursue her own anti-death penalty agenda." (Centobie Declaration, p. 1). Centobie explains that he met with Puzone because he thought that she wanted to be his friend, and that she was helping him find his son. With respect to the instant motions, Centobie states that he had never seen them before they were shown to him by a representative of the Attorney General's office, and that he is "opposed" to the relief sought. He further refutes Puzone's allegations that he is mentally incompetent, stating that "the

7

only kind of mental condition that I may be suffering from is depression which is just a condition of being a [sic] death row in my opinion." (*Id*. at p. 2).

In light of Puzone's own admissions, coupled with Centobie's clear mandate, Puzone cannot be deemed to be acting in his best interests. However well-intentioned Puzone may be, her conduct in filing the instant motions must be viewed in light of *Whitmore* as legal "meddling" by an "intruder."

In addition, Puzone has not satisfied the first prong of the test: she has not made any substantial showing that Centobie is mentally incompetent and unable to make his own decisions in regard to this litigation. As discussed more fully below, there is no genuine issue as to Centobie's mental competency. Consequently, Puzone lacks standing to assert the claims, and her petition is due to be dismissed.

**NON-EXHAUSTION OF STATE REMEDIES**

Even assuming that the instant petition and motion for emergency stay are properly filed by counsel as a third-party next friend of Centobie, she has not exhausted his available state remedies with respect to his *Ford* claim insofar as the present filing is treated as a habeas petition under either 28 U.S.C. § 2241 or § 2254. Although non-jurisdictional in nature, exhaustion of state remedies is a precondition to seeking habeas relief, arising from considerations of comity and due respect for the primary role of state courts in adjudicating and correcting constitutional errors. *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999); *Dill v. Holt*, 371 F.3d 1301 (11th Cir. 2004). Although originating in case decisions, the exhaustion requirement has been codified since the enactment of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). At § 2254(b) and (c), the statute provides the following:

8

>  (b)(1)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that--
>
>> (A)  the applicant has exhausted the remedies available in the courts of the State; or
>
>> (B)(i)  there is an absence of available State corrective process; or
>>   (ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.
>
>  (2)  An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.
>
>  (3)  A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement.
>
>  (c)  An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

As made plain by this statutory provision, exhaustion of state remedies is a mandatory precondition to obtaining federal habeas relief. The statute explicitly instructs that habeas relief "shall not be granted ... unless it appears that ... the applicant has exhausted the remedies available in the courts of the State." Further, the State's failure to plead exhaustion cannot be deemed a waiver of the exhaustion requirement; such a waiver must be made expressly.[6] For these reasons, the court has addressed these exhaustion requirements *sua sponte*, even though they are not raised explicitly in the State's motion to dismiss.

---

[6]The court is cognizant of the pre-AEDPA holding in *Davis v. Dugger*, 829 F.2d 1513 (11th Cir. 1987), that a federal habeas court must await a responsive pleading from the State before invoking the exhaustion requirement. The enactment of AEDPA, however, eroded the rationale for *Davis*. The court of appeals reasoned in *Davis* that the State could elect to waive the exhaustion requirement either expressly or by failing to assert it. Under the current statute, there is no waiver by default; the State must expressly waive exhaustion. The congressional mandate expressed at § 2254(b) and (c) requires the court to examine the question of exhaustion.

One of the claims presented on behalf of Centobie in this action is the allegation that he presently is mentally incompetent and, therefore, cannot be put to death consistent with the Eighth Amendment as construed in *Ford v. Wainwright*, 477 U.S. 399 (1986). Nothing in the emergency petition suggests that he (or anyone purporting to act for him) has filed any motion or petition seeking relief in the Alabama state courts. Indeed, Alabama provides a remedy for just this sort of claim. Alabama Code § 15-16-23 (1975) provides as follows:

> **§ 15-16-23. Suspending execution of death sentence of insane convict; order upon restoration to sanity; limitations on jurisdiction to suspend execution.**
>
> If after conviction and sentence to death, but at any time before the execution of the sentence, it is made to appear to the satisfaction of the trial court that the convict is then insane, such trial court shall forthwith enter an order in the trial court suspending the execution of the sentence to the time fixed in the order; and, if it subsequently is made to appear to the court that such convict, the execution of the sentence of whom has thus been suspended, is restored to sanity, the trial court shall forthwith have another order entered ordering and commanding the execution of the judgment and sentence originally awarded in said court at a time fixed in such order. This mode of suspending the execution of sentence after conviction on account of the insanity of the convict shall be exclusive and final and shall not be reviewed or revised by or renewed before any other court or judge. No court or judge in this state shall have the power or right to suspend the execution of sentence of any other court of record on account of the insanity of the convict. This section shall not prevent the judge or court from impaneling a jury to try the question of insanity or from examining such witnesses as he may deem proper for guidance.

Plainly, Alabama law provides a procedure for suspending the death sentence of an insane inmate until such time, if ever, that he is restored to sanity. Section 15-16-23 provides an adequate state law remedy for a *Ford* claim–it expressly establishes a procedure by which the execution of a death sentence may be suspended due to the insanity of the inmate. *Cf. Magwood v. Smith*, 791 F.3d 1498

(11th Cir. 1986) (finding that a § 15-16-23 hearing is a constitutional remedy to a *Ford* claim). Moreover, the importance of this provision lies not only in the remedy it provides the inmate, but also the fact-finding which must be made by the state court in response to such a petition. A state court should be given the first opportunity to address the claim raised on behalf of Centobie, including having the first chance to determine the facts related to his competence. Under § 2254(d) those fact-findings would be presumptively correct upon review in this court, thereby lessening the conflict between state and federal courts. The exhaustion requirement was designed for this very purpose.

Because it does not appear that Centobie has exhausted this state remedy for his *Ford* claim, this court must deny the requested stay and dismiss the petition for want of exhaustion. *Rose v. Lundy*, 455 U.S. 509 (1982). If and when Centobie has exhausted this state remedy, only then may he seek federal habeas relief.[7]

## **HABEAS STAY OR PRELIMINARY INJUNCTION**

Finally, even if the petition filed on behalf of Centobie could survive the procedural obstacles discussed to this point (and it cannot), the court is persuaded that an order halting his scheduled execution would have no basis in law. Whether analyzed under habeas law or § 1983, the same standards apply and the same conclusion must be reached: there has been absolutely no showing of a substantial likelihood that Centobie (or anyone on his behalf) would succeed on the claim that he

---

[7]The court does not make this observation lightly and is fully aware that it is the eleventh hour. However, two critical observations must be made. First, Centobie makes it quite clear in his declaration presented to this court that he does not wish to seek relief and that he has told Puzone, his previous lawyers, and his family not to pursue any relief on his behalf. Second, Centobie reports that Puzone had ample time to seek a mental competency evaluation within the last six months, but that it was her strategy to wait until the last minute to file something in a "last-ditch effort to stop [his] execution." Centobie Declaration at ¶ 5.

11

is insane and cannot be executed for that reason.

As a threshold matter, it is not clear whether the remedy being sought for Centobie is habeas in nature or the assertion under § 1983 of an Eighth Amendment constitutional right not to be executed while insane. The emergency petition invokes both habeas law and § 1983. Under the Supreme Court's reasoning in *Nelson v. Campbell*, 541 U.S. 637 (2004), the petition arguably does not attack the legality or constitutionality of Centobie's conviction or death sentence, but asserts only that in his current state of alleged incompetence, the Eighth Amendment precludes *execution* of that sentence. Such an attack on the imminent execution of sentence is not within the "core" of habeas law; rather, it challenges the alleged unconstitutional manner in which a *valid* sentence is to be carried out. The distinction is academic in this case because the standards to be applied are the same, whether viewed as a stay of execution under habeas law or a preliminary injunction to prevent a threatened violation of constitutional law.

To be entitled to a federal habeas stay of execution of sentence, a petitioner must show four things: (1) a substantial likelihood of success on the merits of the claim, (2) irreparable injury if the stay is not granted, (3) whether the stay would substantially injure other parties, and (4) that the stay serves the public interest. *In re Holladay*, 331 F.3d 1169 (11th Cir. 2003); *Bundy v. Wainwright*, 808 F.2d 1410 (11th Cir. 1987). These same standards apply when the court is considering a temporary restraining order or preliminary injunction. *See Schiavo ex rel. Schindler v. Schiavo*, ___ F.3d ___, 2005 WL 648897, *1 (11th Cir., March 23, 2005); *Siegel v. Lepore*, 234 F.3d 1163, 1176 (11th Cir. 2000)[8]; *see also, Robinson v. Crosby*, 358 F.3d 1281 (11th Cir. 2004). In the context of

---

[8]The court notes that the case law refers to the grant of preliminary injunctive relief as a "drastic" and "extraordinary" remedy. *See, e.g., Siegel v. Lepore*, 234 F.3d 1163, 1176 (11th Cir. 2000). Such language has been used in connection with stays only with respect to second or

challenges to the execution of a capital sentence, the line between habeas and § 1983 grows increasingly faint.

Turning to the four-part test, the court is persuaded that neither Centobie nor Puzone can establish a substantial likelihood of success on the merits of a *Ford* claim. The information and records submitted in support of the emergency motion indicate, at best, that Centobie suffers from bipolar disorder, and possibly, post-traumatic stress disorder. Both of these conditions are described as "mood disorders," characterized by anxiety, mistrust, aggression, and hyperactivity, but neither condition is characterized by psychosis. A declaration has been offered by Thomas S. Bennett, Ph.D., who admits that he has never met with Centobie and has never performed an evaluation of his mental state. Moreover, the declaration does not even suggest that Centobie is psychotic, has no conception of reality, or is unable to understand that he faces execution and why. Indeed, the facts recited in the emergency motion, and Centobie's own declaration, make clear that Centobie is well aware that he faces execution and that he has chosen not to seek a stay of it.

Although it appears that the Eleventh Circuit has never adopted a definition of insanity or incompetency for purposes of addressing a *Ford* claim, *see, Weeks v. Jones*, 52 F.3d 1559, 1574 (11th Cir. 1995)(Kravitch, J., dissenting), courts generally have asked whether the inmate recognizes that he faces execution and why. As Judge Kravitch noted in her dissent in *Weeks*:

> Since *Ford*, courts have adopted different legal definitions of Eighth Amendment mental competency for execution. *Compare Rector v. Clark*, 923 F.2d 570, 572 (8th Cir.) (examining "whether petitioner understands that he is to be punished by execution" and "whether

---

successive habeas petitions. *See, e.g., Felker v. Turpin*, 83 F.3d 1303 (11th Cir.1996). The court has found no cases describing the degree to which the grant of stays on initial habeas petitions is seen as unusual or extraordinary, although the court is confident that the grant of a stay is regarded as unusual due to its comity implications.

13

> petitioner understands why he is being punished"), *cert. denied*, 501 U.S. 1239, 111 S. Ct. 2872, 115 L. Ed. 2d 1038 (1991) *with Lowenfield v. Butler*, 843 F.2d 183, 187 (5th Cir.) (evaluating whether petitioner is "unaware that he is about to be put to death as a result of his earlier conviction and sentence for murder"), *cert. denied*, 485 U.S. 1014, 108 S. Ct. 1487, 99 L. Ed. 2d 714 (1988) and *Martin v. Dugger*, 686 F. Supp. 1523, 1566-73 (S.D. Fla.1988) (holding that a "prisoner need only appreciate the connection between the crime and its punishment" in order to be executed), aff'd on other grounds, 891 F.2d 807 (11th Cir. 1989).

*Id.* at 1574. This case does not turn on the subtleties of how the test is articulated. The so-called evidence presented in support of the emergency motion simply fails to raise any substantial doubt concerning Centobie's current competence. Dr. Bennett's certification, based only on a limited study of records, police reports, and "information [provided] to me from [Ms. Puzone's] interviews of Centobie's friends and family," reflects no first-hand psychological evaluation and hypothesizes only that Centobie may have bipolar disorder and, perhaps, post-traumatic stress disorder. Dr. Bennett does not offer any conclusive opinions, and does not even attempt to suggest that Centobie suffers from delusions or hallucinations, or has lost touch with reality.

Further undermining Dr. Bennett's opinions is the fact that all of the evidence he draws on for support is based on events occurring before 1998, when the murder for which Centobie stands convicted occurred. In December 1998, Centobie underwent a psychological evaluation in connection with the claim that he was not competent to stand trial for the murder of Officer Turner. Dr. Ronan performed that evaluation and filed her report in February 1999. At that time, Dr. Ronan made various findings including that Centobie was competent to stand trial, that "there was no evidence of thought disorder," and that his "thought structure was logical and relevant." She wrote further concerning his emotional stability that "[h]e demonstrated a wide range of mood, which

14

varied according and appropriately to what he was discussing, however, there was no lability indicated during the evaluation, rather normal responsivity." Dr. Ronan reported that although his speech was "rapid, emotional, expressive, and understandable" and that his mannerisms were "slightly expansive," these were "within normal limits for the situation, and in particular for him." She observed no cognitive deficits; rather, he was oriented to person, place, month, year, day of the week, time, and situation. Indeed, she found that his "abstract reasoning, overall judgment and insight, and general knowledge [were] adequate," and that he scored in the "High Average to Superior ranges" on intelligence testing.[9] In short, the evidence produced by a genuine psychological evaluation totally refutes Dr. Bennett's unsupported speculation.

The emergency motion also argues that Centobie must be incompetent because he refuses any further appeals and has expressed the wish to be executed. That argument is off the mark as well. Centobie has consistently admitted his role in the murder of Officer Turner, even taking the witness stand at trial to confess it. His position has not changed since his trial – he takes responsibility for the police officer's murder and does not wish to avoid the consequences of it. There is nothing new about Centobie's current position that he does not want any further appeals or efforts to forestall his execution. Nor is there anything remotely psychotic about it. The court cannot conclude that Centobie is incompetent to make decisions concerning his fate simply because he chooses to accept responsibility for his crime and meet his death.

Perhaps most telling is Centobie's declaration filed in support of the motion to dismiss. In it he clearly acknowledges his legal position, the imminence of his execution, and his legal options.

---

[9]This further contradicts Dr. Bennett's completely unsupported speculation that Centobie may be suffering from an organic brain disorder following a head injury as a child.

He has rationally chosen to forgo further efforts to stop his execution, and he actively opposes the current petition filed by Puzone. He has planned for his death, and expressed his desire not to spend the rest of his life in prison.

Centobie's rationality and competence are further supported by the affidavit of Lesleigh Dodd, a mental health professional possessing a master's degree in psychology, who observed the interview between Centobie and counsel for the respondent yesterday. She noted no signs of thought disorder and observed that Centobie was oriented to person, place, and time.[10]

In sum, the evidence and information submitted in support of the motion for an emergency stay not only fail to make a threshold "substantial showing" that Centobie is mentally incompetent, the 1999 evaluation performed on him refutes the assertion. In the absence of a genuine question regarding Centobie's mental competence, Puzone cannot establish "a substantial likelihood of success on the merits" of his *Ford* claim.

## LETHAL INJECTION PROTOCOL

Although counsel filing the instant emergency motion and petition makes a number of allegations "on information and belief" about the inadequacy of the Alabama lethal injection protocol, she has presented no evidence supporting any of them. On this ground, the motion asserts

---

[10]The court notes that Dodd reported that Centobie recognized that he was talking with counsel for the State and that he "understood this and that he was talking to the 'devil' and the 'enemy' to stop Puzone from filing anything on his behalf to stop the execution." The court does not believe this single statement indicates any delusions or thought disorders on the part of Centobie, even in light of all the evidence presented by Puzone. Rather, Centobie appears to have meant the statement to be more metaphorical than literal. But even if literal, and even if Centobie has "significant behavorial and emotional problems" that have led to a troubled life, he is in no different position than the inmate in *Ford v. Haley*: there is ample evidence that he fully understands his legal situation, has chosen not to challenge his execution, and understands why he is under a death sentence. *Ford v. Haley*, 195 F.3d at 616, 617-625.

nothing more than speculation about the manner, sequence, efficacy, and effect of administration of drugs used to carry out execution by lethal injection in Alabama. No affidavit or other evidence has been offered to bolster the assertion that drugs used in Alabama fail to cause a painless death, but rather cause excruciating pain. No medical or scientific evidence is proffered, and no first-hand evidence is presented about the actual protocol used in Alabama. The emergency motion simply fails to present any issue other than that the court should stop the execution to look into unsupported allegations. Puzone cannot meet the requirement of showing a substantial likelihood of success on the merits of the Eighth Amendment claim. Neither Puzone nor Centobie is entitled to any emergency order precluding his scheduled execution.

## CONCLUSION

Based on the foregoing considerations, the court finds that it lacks subject-matter jurisdiction to consider the petition for writ of habeas corpus and the emergency motion for a stay of execution. Even if the court has such jurisdiction, no stay of execution is warranted. Accordingly, the petition for writ of habeas corpus is due to be dismissed, and the motion for stay of execution is due to be denied. A separate order will be entered contemporaneously with this Memorandum Opinion.

**DONE** and **ORDERED** this ___26th___ day of April, 2005.

                                                    **R. DAVID PROCTOR**
                                                    UNITED STATES DISTRICT JUDGE